CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
AUG 1 2 2011
JULIA C. DUDLEY, CLERK
BY: /s/ 
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY<br>        *Plaintiff,*<br><br>v.<br><br>DEBORAH BOWLES, et al.<br>        *Defendants.* | CIVIL ACTION NO. 6:09-CV-44<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

  Pending before the court are the parties' cross-motions for summary judgment under Rule 56, or in the alternative, for judgment under Rule 52 (docket nos. 29 and 31). Defendant Deborah Bowles ("Deborah") is the plaintiff in a state court tort suit arising out of a single-vehicle automobile accident in which she alleges that Defendants Darrell Creasy ("Creasy") and Douglas Fitch ("Fitch") recklessly or negligently caused her injury. In this action, the parties seek a declaratory judgment whether Deborah is entitled to coverage under certain provisions of an insurance policy issued by Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") to Deborah's mother, Virginia M. Taylor ("Virginia"). As I find that Deborah was not covered, I will grant State Farm's motion pursuant to Rule 52, deny Deborah's motion, and enter a declaratory judgment in favor of State Farm.

### I.

  The accident giving rise to the underlying tort suit occurred on July 25, 2008, in Campbell County, Virginia. Following the accident, Deborah served process on State Farm pursuant to Virginia Code § 38.2-2206, claiming coverage under the uninsured motorist

1

provision of a State Farm Personal Auto Policy (No. 364 7100-D18-46I) issued to Virginia (the "Policy"). In relevant part, the Policy provides:

> We will pay, in accordance with Va. Code Ann. Section 38.2-2206, damages which an "insured" or an "insured's" legal representative is legally obligated to recover from the owner or operator of an "uninsured motor vehicle" or an "underinsured motor vehicle" because of:
>
> 1. "Bodily injury" sustained by an "insured" and caused by an accident; and
> 2. "Property damage" caused by the accident.[1]

The term "insured" includes "You or any 'family member.'" "Family member" is defined as "a person related to you by blood, marriage or adoption who is a resident of your household." "You" means the "named insured," or in this case, Virginia Taylor.

### A.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Here, however, the parties have jointly stipulated (docket no. 28) that to the extent there are any genuine issues of material fact, the court may resolve such disputes by way of summary trial pursuant to Rule 52, based on a record consisting of the pleadings, admissions, deposition testimony, and other documents.

Deborah bears the burden of showing that she was a resident of Virginia's household within the meaning of the Policy, and therefore that she was entitled to coverage. *See Furrow v. State Farm Mut. Auto. Ins. Co*, 375 S.E.2d 738, 740 (Va. 1989). The law distinguishes between one who has "assumed a residence and become so intertwined with the [insured's] family as to

---

[1] The policy also provides medical expense benefits coverage to an "insured" who sustains "bodily injury."

2

become a member of that family," and one who is merely "a visitor or sojourner in the [insured's] home." *State Farm Mut. Auto Ins. Co. v. Smith*, 142 S.E.2d 562, 566 (Va. 1965) *overruled on other grounds by State Farm v. Jones*, 383 S.E. 2d 734 (Va. 1989).

> Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness.

*Smith*, 142 S.E.2d at 566 n.6 (quotation omitted). "The word 'household' . . . connotes a settled status; a more settled or permanent status is indicated by 'resident of the same household' than would be indicated by 'resident of the same house or apartment.'" *Id.* at 565-66.

In determining whether an individual is a resident of the insured's household, courts in Virginia have looked to a number of non-dispositive factors. These include the extent to which the claimant (1) intends to be a permanent resident of the household;[2] (2) has regular, versus erratic contacts with the household; (3) actually stays at the residence; (4) maintains a close, or strained relationship with other members of the household; (5) pays rent, board, or otherwise contributes to household expenses or maintenance; (6) keeps personal property at the residence; (7) receives substantial mail at the residence; and (8) maintains a room or other private space in the residence. *See Phelps v. State Farm Mut. Auto. Ins. Co.*, 426 S.E.2d 484 (Va. 1993); *Allstate Ins. Co. v. Patterson*, 344 S.E.2d 890, 893 (Va. 1986); *Smith*, 142 S.E.2d at 566; *Farmers Insurance Exchange v. Saunders*, 78 Va. Cir. 74 (2008); *Dawson v. Auto-Owners Ins. Co.*, 2008 WL 1836506, at *4 (W.D. Va. Apr. 23, 2008). "The regularity and quality of contacts . . . are the

---

[2] Deborah cites *Allstate Ins. Co. v. Patterson*, 344 S.E.2d 890, 893 (Va. 1986) for the proposition that intent is dispositive. It is not. *Patterson* merely holds that "a person's intent is *important* in determining whether he qualifies as a resident of a particular household." *Id.* (emphasis added). Moreover, if intent were dispositive, it would not help Deborah's case. See part III(B), below.

most significant factors for determining residence in a household." *Dawson*, 2008 WL 1836506, at * 4.

## II.

A small number of facts are not in dispute. Deborah's mother, Virginia Taylor, owns a house located at 1100 Tillers Ridge Drive in Richmond, Virginia. She has lived there since 2006, along with Deborah's five children, over whom she has custody. From early 2007 to early 2009, Deborah's sister Diane Taylor ("Diane") also lived at the house, along with her four children. The parties agree on little else.

### A.

Deborah testified that she also lived at 1100 Tillers Ridge Drive. According to Deborah, she stayed at the house for the entirety of 2009, with the exception of a few nights that she spent at a cousin's house, in jail, or in various medical facilities. Deborah Dep. at 15-17. When asked how long she had been living at the house as of July 2008, she responded "[s]ince the day my mother moved in that house." Deborah Dep. at 22. She further testified that she stayed at the house overnight, continuously, for the period beginning January 2008 up to the time of the accident. Deborah Dep. at 30. Moreover, she indicated that at the time of the accident, she had a house key that she had received several weeks after moving in. Deborah Dep. at 60. Although she did not have a bedroom during the period, she regularly slept on the couch in the family room. Deborah Dep. at 30. She kept clothing at the house, in her own drawer and closet, and received mail at the address, including her Social Security and child support payments. Deborah Dep. at 52, 35. Others confirmed that Deborah received mail at the residence. Virginia Dep. at 16; Diamond Dep. at 27.

Deborah further testified that she has had significant household responsibilities at 1100 Tillers Ridge Drive, including grocery shopping, cleaning, and preparing meals. Deborah Dep. at 41-42, 60. She further indicated that she has paid her mother $500 per month in rent "[e]ver since I've been living with [her]." Deborah Dep. at 60-61.[3]

According to Deborah, one night prior to the accident, she was staying with Douglas Fitch in Campbell County. However, she claimed that she was merely planning to stay with Fitch for a weekend cookout. Deborah Dep. at 20. And both Fitch and her friend Crystal Powers were under the impression that Deborah lived in Richmond with her mother. Fitch Dep. at 8; Powers Dep. at 18. Nonetheless, neither Powers nor Fitch knew for certain where Deborah lived. Powers Dep. at 20, 24, 28, 44-45; Fitch Dep. at 37.

### B.

State Farm's witnesses tell a remarkably different story. In particular, the testimony of Deborah's mother, Virginia; her daughter, Diamond Bowles ("Diamond"); and her sister, Diane, all of whom lived at the house as of July 25, 2008, gives the strong impression that Deborah was at most a transient guest of 1100 Tillers Ridge Drive.

According to Virginia, Deborah had been at the house "off and on" but "[n]ot on a permanent basis." Virginia Dep. at 10. "She would just come and go. She may be two months,

---

[3] Deborah also attempts to introduce certain documentary evidence. (See docket no. 32-5, 32-6, and 32-7). In particular, this evidence shows that Deborah used the Tillers Ridge Drive address on various forms, including documents from the public schools that her children attended. Perhaps more significantly, a "Rider Trip List Report" from LogistiCare Solutions, LLC, a non-emergency medical transportation company, showed that Deborah was either picked up, or dropped off for medical care, at Virginia's house, on dozens of occasions between 2007 and 2009. Because these documents have not been authenticated pursuant to Rule 901, and constitute inadmissible hearsay under Rule 802, I may not consider them. Deborah rightly contends that admissibility rules are somewhat relaxed in the summary judgment setting. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (holding that a party need not submit evidence in admissible form "to avoid summary judgment"); U.S. Dept of Housing & Urban Development v. Cost Control Marketing & Sales Management of Va., Inc., 64 F.3d 920, 926 (1995) (noting that while inadmissible evidence is "ordinarily an inadequate basis for summary judgment," the rule is "not unfailingly rigid."). However, there is no reason to surmise that the rules of evidence are relaxed in a bench trial pursuant to Rule 52. Furthermore, even if I were to consider the evidence, it would not change the outcome because of the strength of the testimony discussed in part II(B), below.

three months. She'll come back maybe stay a couple days or so. Then she'll be gone again." *Id.* When asked whether Deborah lived at the house in July 2008, Diamond said "I wouldn't say she lived there. She would come and go." Diamond Dep. at 13. She also concurred that Deborah "would stay for a period of probably two days and she would leave" for a period of months. *Id.* at 14. Moreover, Deborah's sister testified that Deborah "stayed with everybody," and that Deborah "wasn't at [her] mother's house" from the beginning of 2008 through the day of the accident. Diane Dep. at 12, 13, 26. And although Deborah indicated that she lived at the house through the entirety of 2006, Diane said:

> during 2006, I don't know where she was living. My sister be everywhere. You can't pinpoint. . . . She'll call you and tell you she's in North Carolina. She'll tell you she's in at Atlanta, Georgia. She'll tell you I'm in New York. . . . She'll tell you she's in Tennessee. So I can't really tell you that's where she was because we . . . barely see her.

Diane Dep. at 16-17. If Deborah stayed at the house in 2006, "it would be for [a] night and that's it. She gone the next day. Then we don't see her for a couple of months." *Id.* at 19. Diane estimated that Deborah stayed at the house "five [or] six" times through the entire year. *Id.* at 18.

Virginia could not estimate what percentage of time Deborah stayed at the house, because she was "in and out all the time." Virginia Dep. at 10. Nor could Virginia estimate how many days in a row Deborah would stay because "it was very seldom." *Id.* at 11. When asked how many days a month Deborah spent at the house, her mother responded "How many days a month, sometimes that girl be gone for about two, three months at a time." *Id.* at 19. When asked how many days Deborah stayed at the house in the year leading up to the accident, she was likewise unable to do so. *Id.* at 47. Both Virginia and Diane testified that Deborah's absences would be so extended that they did not know whether Deborah was dead or alive. *Id.* at 46; Diane Dep. at 21.

6

Although Virginia confirmed that Deborah received mail at the house up to the time of the accident, her testimony gives the impression that Deborah used the location as more of a post office box than a home. Virginia would typically only see Deborah at the beginning of the month, when Deborah would pick up her disability checks. Virginia Dep. at 12-13. She explained that because "Deborah used to move so many places she never did change her address. If she left it at my house, she was sure to get [her mail], you know." *Id.* at 17. Moreover, there is evidence that Deborah forwarded her important mail to other addresses. For instance, on June 14, 2007, Deborah sent a letter to the Virginia Department of Child Support Enforcement, which said, in relevant part: "Please forward all my mail to my new address 115 Grigg Street, Petersburg, VA 23803. I've been here since May 1st." Docket no. 33, Ex. 6. She likewise received mail at the Petersburg address from the Virginia Department of Corrections in June 2007. *Id.* Furthermore, she had her Social Security check delivered to Crystal Powers's house immediately after the accident. Deborah Dep. at 35.

Virginia did not consider Deborah to be a member of the household as of July 25, 2008 "because she told me she moving up to Lynchburg . . ." Virginia Dep. at 28. Diane similarly said that "at th[e] point of the accident, she was living in Lynchburg." Diane Dep. at 27, 43. Likewise, Deborah's aunt, Martha Ann Harvey ("Harvey") testified that the day after the accident, Deborah called her to say "[s]he was in Lynchburg Hospital and she said she was living there with some friends . . . ." Harvey Dep. at 8 (emphasis added). Moreover, Crystal Powers testified that when Deborah stayed with her in Red House, Virginia, after the accident, Deborah asked if they could "just get a big house and live in it [together]." Powers Dep. at 13, 34. Contrary to Deborah's testimony, Powers also indicated that Deborah had been staying in Lynchburg for about a month prior to the accident, not one or two days. Powers Dep. at 12.

According to Virginia, when Creasy and Fitch picked Deborah up to take her to Lynchburg, she took "everything she owned" with her. Virginia Dep. at 26-27. Diamond said that this was common practice. When Deborah left 1100 Tillers Ridge Drive, "her clothes and everything go with her." Diamond Dep. at 16. Both Diamond and Diane testified that Deborah did not keep personal property at the house, and she did not have a dresser or a closet at the house. Diamond Dep. at 16; Diane Dep. at 65. According to Harvey, who claimed to have visited the house two or three times per week in 2008, there was no indication that Deborah lived there during the period. *Id.* at 16, 18. Moreover, both Virginia and Diane denied that Deborah ever had a key. Virginia Dep. at 48; Diane Dep. at 24.

State Farm's witnesses also call into question the extent to which Deborah assumed household responsibilities. Virginia denied that Deborah paid rent. Rather, she said, "if Deborah had [money] and I catch her, Deborah would give me whatever, 500, 400," but the payments were in "bits and pieces . . . ." *Id.* at 52. Diane was under the impression that Deborah provided no financial support whatsoever. Diane Dep. at 27-28. Moreover, while Diamond acknowledged that Deborah would buy groceries when she was around, she also testified that Deborah did "[n]othing really significant at all" to help out around the house. Diamond Dep. at 18-19. Diane likewise indicated that Deborah neither cooked nor cleaned. Diane Dep. at 18, 27.

Finally, State Farm's evidence tends to show that Deborah had a strained relationship with members of the household. Although she initially testified to the contrary, Deborah ultimately admitted that her mother had sole legal and physical custody of all of her children. According to Virginia, she took custody because Deborah "didn't have a permanent place for [the children] . . . to live." Virginia Dep. at 40. Diane testified that Diamond "don't have too much to say to [Deborah]," and "her youngest son don't even respect her." Diane Dep. at 20.

8

She further testified that she locked her doors when Deborah was around, because she was afraid that Deborah would steal from her. Diane Dep. at 64.

### III.

In light of the foregoing, it is apparent that there are genuine issues of material fact that cannot be resolved without judging the credibility of witnesses or weighing the evidence. It would therefore be inappropriate to enter judgment under Rule 56. *See Reeves*, 530 U.S. at 150. However, because the weight of the evidence supports State Farm's position, and Deborah's testimony is not generally credible, Deborah fails to meet her burden of proving coverage, and I will therefore enter judgment under Rule 52.

### A.

The great bulk of the admissible evidence in this case consists of deposition testimony, and Deborah's case rests largely on her own statements.[4] Given the inconsistency between Deborah's testimony, and that of her mother, sister, and daughter, Deborah's credibility is of vital importance to her case. But Deborah is simply not credible. First, she has an evident financial stake in the outcome of this litigation. Second, she has three acknowledged felony drug convictions. *See* Fed. R. Evid. 609. Finally, and most significantly, it is conclusively established that she gave false testimony on numerous occasions in this case. For instance, she testified that she had custody of her children, and that her mother merely had guardianship rights. Deborah

---

[4] Deborah argues that Powers and Fitch corroborate her story that she lived in Richmond with her mother. However, the corroboration is weak. The Powers and Fitch depositions show that Deborah misled them about her living arrangements. Deborah told Powers that she was until recently living in a "big house" that she had to sell for financial reasons. Powers Dep. at 35. Deborah told Fitch that she had just built or bought a house. Fitch Dep. at 29-30. Neither of those contentions is accurate. Moreover, because Powers and Fitch lived in the Lynchburg area, they had little opportunity to observe Deborah's activities at 1100 Tillers Ridge Drive. Finally, although they surmised that Deborah was living with her mother, both Powers and Fitch testified that they did not know for certain where Deborah lived.

9

Dep. at 6. When confronted with documentary evidence to the contrary, she admitted that that was false. Deborah Admis. ¶¶ 22-31. She claimed that from July 2006 through July 2008, she "always lived at Tillers Ridge Drive," and that she received mail only at that address during the period. Deborah Dep. at 34-35. However, when confronted with documentary evidence to the contrary, she admitted that this, too, was false. Deborah Admis. ¶¶ 2, 6. She further testified that she slept at Virginia's house every night from January 1, 2010 through February 23, 2010, with the exception of a stay at the Richmond Bon Secours Community Hospital. Deborah Dep. at 14-15. But she later admitted that she also stayed at a hotel for several days during that February. Deborah Admis. ¶¶ 14-15. This pattern of offering self-serving testimony, then recanting, casts grave doubt on Deborah's truthfulness.

I am mindful of the incentive that Virginia may have had to exaggerate her testimony. Virginia was angry that Deborah used her insurance information, and she feared that her premiums would increase as a result of this litigation. Virginia Dep. at 42-44. However, her testimony was largely corroborated by that of Diane, Diamond, and Harvey. Moreover, where her testimony differed, it was not uniformly beneficial to her case. For instance, Virginia testified that Deborah would occasionally give her a few hundred dollars, but Diane testified that Deborah provided Virginia with no financial support. In addition, it bears noting that witnesses who have little if any stake in this litigation also contradicted Deborah on key points. For instance, although Deborah testified that at the time of the accident she was only in the Lynchburg area for a weekend cookout, Powers said that Deborah been in the area for about a month, and Harvey testified that Deborah was "living in" Lynchburg.

## B.

Rule 52 provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Conclusions of law are set forth in part I(A), discussing the applicable legal standards, and footnote 3, resolving an evidentiary dispute.

Considering the credibility of the witnesses and the weight of the evidence, I make the following findings of fact: At the time of the accident, Deborah intended to reside in the Lynchburg area, not Richmond. She had minimal, irregular contacts with Virginia's household, and led an itinerant life, spending the great majority of her time away from the residence. She did not keep significant personal property at the house, and she did not have a place to keep personal property at the house. Contrary to her testimony, she did not have a key to the house. Although she received mail at 1100 Tillers Ridge Drive in the period leading up to and following the July 25, 2008 accident, she also forwarded substantial mail to other addresses. While she occasionally gave her mother money, the payments were not regular, and did not constitute rent. Although she occasionally bought groceries, her contributions to the maintenance of the household and well-being of her family were nonetheless insignificant. Moreover, she had a strained relationship with several members of the household. In sum, the quality and regularity of her contacts with the household were low.

Accordingly, I further find that Deborah had no "settled or permanent status" at 1100 Tillers Ridge Drive as of July 25, 2008. *Smith*, 142 S.E. 2d at 566. She was more of a visitor or sojourner than one whose life was intertwined with the family. *Id.* Therefore, Deborah was not a "resident of [the insured's] household" within the meaning of Virginia's insurance policy.

**IV.**

For the foregoing reasons, I will grant State Farm's motion pursuant to Rule 52, deny Deborah's motion, and enter declaratory judgment in favor of State Farm.

The Clerk of the Court is directed to send a certified copy of this opinion to all counsel of record.

Entered this 12th day of August, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE